UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHLEEN A. DAVIS,

    Plaintiff,

vs.

SOUTHFIELD PUBLIC
SCHOOL DISTRICT and
BEVERLY GELTNER,

    Defendants.
_____/

Civil Action No.
07-CV-13559

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the court on defendants' motion for summary judgment [docket entry 15]. Plaintiff has filed a response in opposition and defendants have filed a reply. The parties have also submitted supplemental briefs at the court's request. Pursuant to E.D. Mich. LR 7.1(e)(2), the court shall decide defendants' motion without conducting a hearing.

This is an employment discrimination action. Plaintiff Kathleen Davis, a former human resources manager with defendant Southfield Public School District, alleges that at a staff meeting in June 2005 defendant Geltner, the district's interim superintendent, "used racially derogatory remarks about the perceived lack of intelligence of African American staff members, including but not limited to, referring to them as 'dumb blacks.'" Complaint ¶ 17. Plaintiff complained about these remarks to her supervisor, James Smyth, who allegedly relayed plaintiff's complaint to Geltner, who in turn allegedly retaliated against plaintiff by "increasing her work load, setting unreasonable deadlines for completion of projects, and assigning conflicting priorities so that Davis could not feasibly complete all assigned tasks" and, ultimately, recommending that the school

board not renew plaintiff's contract. *Id.* ¶¶ 18-21, 35. The board followed this recommendation following a hearing in April 2006. *See id.* ¶ 37. Plaintiff's contract expired in June 2006. *See id.* ¶ 10.

In Count I of the complaint, plaintiff claims that the school district violated her rights under Title VII of the Civil Rights Act of 1962, 42 U.S.C. §§ 2000e, *et seq.*, by retaliating against her for "engag[ing] in protected activity when she opposed the discriminatory practices of Geltner against African-American staff members." *Id.* ¶ 44. In Count II, plaintiff makes the same claim against the school district and Geltner under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §§ 37.2101, *et seq.*

Under Fed. R. Civ. P. 56©, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson*, 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact

exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

Defendants make a number of arguments in support of their summary judgment motion, but the first one – that plaintiff did not engage in "protected activity" by complaining about Geltner's comments – is dispositive and therefore the others need not be considered.

Both Title VII and the ELCRA prohibit an employer from retaliating against an employee for opposing the employer's unlawfully discriminatory conduct. Under Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Likewise, it is a violation of the ELCRA for "a person . . . [to] [r]etaliate or discriminate against a person because the person has opposed a violation of this act." M.C.L. § 37.2701(a). To establish a retaliation claim under Title VII, plaintiff must prove that

> (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Similarly, to establish a retaliation claim under the ELCRA, plaintiff must prove

> (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Barrett v. Kirtland Cmty. College*, 245 Mich. App. 306, 315 (2001).

3

Plaintiff claims that she engaged in protected oppositional activity by complaining to her supervisors about comments made by Geltner which plaintiff found to be racially offensive. At her deposition, plaintiff testified that defendant Geltner made the "dumb blacks" remark at a June 2005 meeting attended by plaintiff and four other members of the human resources department (Tenesha Gary, Jennifer East-Armstrong, Janet Broom and Audrey Justice). Pltf's dep. at 145. Plaintiff and Geltner are white; Gary, East-Armstrong, Broom and Justice are black. *Id.* Plaintiff testified further as follows:

> Q. During her questioning of one of the secretaries – one of the secretaries made an error in speech and Dr Geltner proceeded to publicly reprimand her for the error. Is that discrimination to ask an employee to use proper speech and grammar?
>
> A. In the terms that Dr. Geltner used, I would say so.
>
> Q. And tell me exactly what the – who was the secretary?
>
> A. Tenesha Gary.
>
> Q. And what did she say?
>
> A. Actually I'm not sure what it was that Tenesha said that set Dr. Geltner off.
>
> Q. Okay.
>
> A. It took me by surprise when Dr. Geltner kind of slammed her hands down on the table or chair or something and started talking about how it makes people sound like dumb blacks when they use expressions like "aksed" instead of asked.
>
>         \*   \*   \*
>
> Q. What else did Dr. Geltner say?
>
> A. Dr. Geltner continued to say that she had called one of the schools at one point and the call was answered by a secretary who was using the same type of expressions. And Dr. Geltner mimicked that

secretary, although I can't remember the exact words, but she mocked or mimicked the secretary.

And she went on to say that if other – that that's why Southfield has a reputation of being dumb blacks [sic]. And she's not going to put up with it anymore and that's –

Q. Ho long did this meeting last?

A. Oh, I would say 30 minutes maybe.

Q. How long did this portion of the meeting last?

A. Oh, just a matter of minutes.

*Id.* at 150-51. Plaintiff testified that she found Dr. Geltner's remark "racially offensive." *Id.* at 49. She complained about it by telephone to her supervisor, Jim Smyth. *Id.* at 58. She also mentioned the incident once to Smyth's successor, Gail Wilson, in December 2005. *Id.* at 48-49. Plaintiff indicated at her deposition that "the basis of [her] lawsuit . . . is that . . . [her] contract was not renewed because [she] complained about Dr. Geltner's comments at the June meeting." *Id.* at 62-63.

Plaintiff has attached Geltner's deposition testimony to her response brief. Geltner testified that she called the June 2005 meeting because there were no substitute secretaries available and because phone calls to the human resources department were not being answered promptly. Geltner dep. at 37. Regarding the comment at issue in this case, Geltner testified as follows:

A. . . . I said, we can't have this. Let's agree, what's a reasonable number of times that the phone should ring before voicemail comes on? And after a little discussion they said four. I said fine, four times. I want you to set all of your voicemails so that they pick up on voicemail after four rings, okay? Okay.
Then I asked some other questions, and someone said, well, you know, we ain't da-da-da and then someone said well, we axe, and I said stop, stop. We are a school system. You are the first office many people deal with. Ain't is incorrect English, we don't say ain't, we say isn't or aren't. We don't say axe, the word is not axe, the word is ask. a-s-k
We're being accused all the time, and I am fighting this whole

5

business and the stereotype and the prejudice. They're calling us dumb blacks. We are struggling against that in every way. I want this to be a University of Michigan Star School District, and I sent a hundred students to the University of Michigan in July with fully paid scholarships.

So my struggle was to raise the reputation of a failing school district, which was perceived by such as such [sic] by the constituents, by Oakland County, by the board who had hired me seven to nothing, by everyone. And I said, in this organization, especially because we're a school, but in any formal organization you're expected to speak correct English that is grammatically correct, you're expected to write correctly and spell correctly, that's what I expect and that's what I need in the school district, period.

Q. Did anyone complain to you after that meeting about your use of the phrase "dumb blacks"?

A. No, because I didn't say dumb blacks. I said that's what we're being called.

Q. You used the phrase "dumb blacks," correct?

A. I said that outsiders are calling the district dumb blacks, and that's what we're fighting against.

*Id.* at 45-47.

For plaintiff's complaints about Geltner's comments to qualify as *protected* oppositional activity, the comments must constitute "an unlawful employment practice" under Title VII or "a violation" of the ELCRA. *See* 42 U.S.C. § 2000e-3(a); M.C.L. § 37.2701(a). At a minimum, plaintiff must have had "a good faith belief" that she was opposing an unlawful employment practice. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (Title VII case); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (ELCRA case).

Plaintiff has failed to make the required showing. Unlawful employment practices by an employer are defined by Title VII as follows:

6

> **(a) Employer practices**
>
> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2. Similarly, the ELCRA provides in relevant part that an employer shall not

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
>
> (b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

M.C.L. § 37.2202(1). Geltner's comments that the Southfield school district "has a reputation of being dumb blacks" and that employees contribute to that reputation by mispronouncing words or by using improper grammar do not fall within these statutory prohibitions. Nor has plaintiff shown that she had a good faith basis for believing that the comments constituted an unlawful employment practice.

In its November 13, 2008, order requiring the parties to file supplemental briefs in this matter, the court directed the parties to address "whether defendant Geltner, by making the

7

remark in question, committed an unlawful employment practice under Title VII or violated the ELCRA."

In response to the court's order, plaintiff cites two Michigan cases which purportedly demonstrate that "Dr. Geltner's comments do violate the act." Pltf's Supp. Br. at 2. Plaintiff cites no federal cases. Plaintiff first cites *Harrison v. Olde Fin. Corp.*, 225 Mich. App. 601 (1998), for the proposition that "racial slurs by a decisionmaker constitute direct evidence of racial discrimination that is sufficient to get the Plaintiff's case to the jury." Pltf's Supp. Br. at 2 (quoting, but not attributing, *Harrison*, 225 Mich. App. at 610, *citing Kresnak v. Muskegon Heights*, 956 F. Supp. 1327, 1335 (W.D. Mich. 1997)). Plaintiff's reliance on *Harrison* is misplaced because it does not suggest that an employer's racially offensive remark *by itself* is actionable. In that case plaintiff, an African-American, alleged that defendant failed to hire her because of her race, in violation of the ELCRA. The trial court granted the employer's summary disposition motion on the grounds that, analyzing the case under *McDonnell Douglas*, plaintiff failed to sufficiently challenge the nondiscriminatory reasons offered by defendant in support of its decision. The court of appeals reversed and remanded for further proceedings because the trial court had analyzed the case incorrectly. Plaintiff testified that she had overheard two of defendant's employees making racially derogatory remarks about her in connection with her employment application.[1] The court of appeals held that these remarks were direct evidence of discrimination and that the *McDonnell Douglas* approach therefore did not apply. Significantly, however, *Harrison* does not suggest that the

---

[1] The first comment, made by one of the employees who interviewed plaintiff, was that plaintiff was "the wrong color" for the job. The other, made by the personnel director, was that plaintiff should not have addressed defendant's corporate counsel by his first name "because plaintiff was black." *Harrison*, 225 Mich. App. at 604.

discriminatory remarks *themselves* were actionable. Rather, the court found that the remarks were *evidence* supporting the alleged statutory violation that "defendant's decision not to hire plaintiff" was racially motivated. *Harrison*, 225 Mich. App. at 610. Therefore, *Harrison* does not support plaintiff's argument that Geltner violated either Title VII or the ELCRA merely by making her comment regarding "dumb blacks."

Plaintiff next cites *Hall v. Detroit Forming, Inc.*, 2008 WL 81268 (Mich. App. Jan. 8, 2008). In that case, plaintiff asserted claims under the ELCRA that his employer discriminated against him based on his race by subjecting him to a hostile work environment and by denying him a promotion. The trial court granted summary disposition for defendant. The court of appeals reversed and remanded for further proceedings on the grounds that racially derogatory comments and actions by defendant's owner and managers sufficiently supported both claims such that they should be resolved by a jury. Specifically, Defendant's owner allegedly told his employees at a staff meeting that "if they didn't like the way he ran the company they could go back and pick cotton." *Id.* at *2. The owner allegedly also sicced his dog on plaintiff, who is African-American, told plaintiff "he trained black dogs to bite black men," and "joked" that "it was his experience that black people are more afraid of dogs than white people." *Id.* Plaintiff also alleged that he was denied a promotion immediately after another applicant for the position told defendant's managers he "refused to take orders from a black man." *Id.* The job was awarded to the applicant who made this statement, although he had less seniority than plaintiff. When plaintiff protested, the manager in charge told plaintiff that "[s]eniority don't mean nothing no more." *Id.* Again, as in *Harrison*, it was not the comments themselves which were actionable. Rather, it was the owner's comments in conjunction with the incident with the dog that supported the hostile work environment claim; and

9

it was the manager's comment regarding seniority and the applicant's anti-black comment that provided evidentiary support for the failure-to-promote claim. Therefore, *Hall* does not support plaintiff's argument that Geltner's comments, by themselves, violated Title VII or the ELCRA.

Insofar as plaintiff suggests that Dr. Geltner's comments were unlawful because they created – or because plaintiff reasonably believed they created – a racially hostile work environment, any such claim is manifestly unsupported by case law. Under Title VII, "[a]ctionable harassment arises where the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (internal quotations omitted). Further,

> we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (internal quotations omitted). Finally, the work environment must be both objectively and subjectively offensive. See *Harris*, 510 U.S. at 21-22, 114 S.Ct. 367.

*Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). Under Michigan law, "whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v. Everett*, 442 Mich. 368, 394 (Mich. 1993). "[W]hether a hostile work environment exists should be determined by an objective

10

reasonableness standard, not by the subjective perceptions of a plaintiff. *Id.* at 388. Further, "a single incident, unless extreme, will not create an offensive, hostile, or intimidating work environment." *Id.* at 395.

With these legal standards in mind, plaintiff could not have believed in good faith that Geltner's comments created a racially hostile work environment. As plaintiff herself has conceded, Geltner did not call the African-American employees at the meeting "dumb blacks," but indicated the school district had a reputation she wanted to counter by ensuring employees spoke English correctly. While Geltner expressed this thought in a crude, insensitive, undiplomatic, and perhaps offensive way, it was an isolated, brief incident which simply was not sufficient to create a racially offensive work environment under either federal or Michigan law.[2]

For the reasons stated above, the court concludes that Geltner did not violate the law by making the statements in question, and that plaintiff could not reasonably believe that she had

---

[2] Cases where a racially hostile work environment has been found generally have been characterized by a lengthy pattern of degrading comments and conduct by co-workers and/or supervisors. For example, in *Calderon v. Ford Motor Credit Co.*, 2008 WL 4830703 (6th Cir. Nov. 6, 2008), plaintiff, who is Hispanic, alleged that over a three-year period her supervisors called her a "fucking spic"; told her she "could not attend a department lunch because 'they [didn't] want [ ] Mexicans'"; said that plaintiff's "people" are good at making straw hats well and asked plaintiff "where's my little Mexican bean"; and told her she was "not white enough" and should "look down when I speak to you." *Id.* at *6. In addition, plaintiff was constantly teased her about her accent and excluded from all department luncheons. On this record, the court found "a pattern of ridicule and treatment sufficient for a jury to conclude that there existed a severe and hostile work environment." *Id.* at *7.

Similarly, in *Jordan v. City of Cleveland*, 464 F.3d 584, 598 6th Cir. 2006), plaintiff, an African-American firefighter, alleged that over a ten-year period his co-workers and supervisors subjected him to "various racial slurs, demeaning jokes and inflammatory graffiti, . . . isolation and segregation within the Division, . . . [and] disparate discipline and additional duties . . . ." The stress eventually caused plaintiff to take an early retirement. The court of appeals upheld the verdict in plaintiff's favor because "a rational jury could find both that a reasonable person would and that [plaintiff] did regard the work environment at Division as abusive." *Id.*

11

done so. Plaintiff's complaints about the comments were therefore not protected oppositional activity under Title VII or the ELCRA. Plaintiff therefore has no viable retaliation claim under either statute. Accordingly,

IT IS ORDERED that defendants' motion for summary judgment [docket entry 15] is granted.


|  |  | S/Bernard A. Friedman____ |
| --- | --- | --- |
| Dated: | December 8, 2008 | BERNARD A. FRIEDMAN |
|  |  | CHIEF UNITED STATES DISTRICT JUDGE |